COMMONWEALTH OF PUERTO RICO, Plaintiff and Appellee, *v.* GERARDO FONALLEDAS CÓRDOVA, Defendant and Appellant.

No. 12594. Decided March 8, 1962.

*Virgilio Brunet* for appellant. *Hiram R. Cancio, Secretary of Justice, Arturo Estrella, Assistant Secretary of Justice,* and *V. M. Sánchez Fernández, Head, Land Division Cases,* for appellee.

Division composed of Mr. Chief Justice Negrón Fernández, Mr. Justice Blanco Lugo, and Mr. Justice Dávila.

MR. JUSTICE BLANCO LUGO delivered the opinion of the Court.

At the request of the Municipal Housing Authority of the Capital, the Governor of the Commonwealth of Puerto Rico filed a proceeding on December 24, 1953 to condemn a parcel of 43.4097 cuerdas owned by defendant Gerardo Fonalledas Córdova. The Nemesio R. Canales housing project was constructed on that parcel for low-income families. The sum of $128,944 was deposited as just and reasonable compensation. Several months later the defendant answered merely challenging the amount of compensation deposited and alleging that that sum amounted to $275,000. Two years later he amended the answer in order to allege that the just and reasonable value of the parcel taken was $372,394.40 (approximately $8,600 per cuerda), and further alleging that damages had been caused to the remainder of the main property which were computed at $32,284. It was therefore urged that the total compensation be fixed at $404,678.40.

The parcel object of the condemnation was part of a larger property having an area of 133.30 cuerdas. Its topography was flat, but in view of the low elevation of the land it was necessary to fill it to an average altitude of seven and one-half feet in order that it would not be flooded by the Puerto Nuevo River at its highest floods. At the time of the taking it did not have water facilities. It was classified by the Planning Board as I-1, that is, that it could be devoted for the development of light industries, commercial purposes, or residential purposes. It did not have direct access to public thoroughfares, although it was situated very near Roosevelt Avenue, a heavy-traffic artery crossing the center of the metropolitan area.

The issue was practically reduced to the determination of the amount of the just and reasonable compensation. After a long proceeding consisting mostly of expert evidence, the Condemnation Part fixed the compensation at the same

sum deposited by the condemnor at the commencement of the proceeding. No more, no less. The defendant appealed.

# I
## Market Value of Condemned Parcel

The principal errors assigned by the owner-appellant deal with the admission and exclusion of evidence on transactions offered for the purpose of determining the market value of the parcel taken. We will state the general rules laid down by this Court on the matter.

The just compensation to which the owner of a parcel taken is entitled is the amount which represents the full value of the property at the time of the taking, and in the absence of a statutory definition on this concept of value we have favored the rule which fixes it by determining the market value of the property taken—"local market," as it is called in Latin America, see Canasi, *El Justiprecio en la Expropiación Pública* 124 (1952)—namely, the price which a buyer would be willing to pay at a voluntary sale and which a vendor would be willing to accept, taking into account the conditions of the property at the time of the condemnation and the most profitable or beneficial use to which it could be devoted within a reasonably near future. *People* v. *Colón,* 73 P.R.R. 531 (1952) ; *People* v. *Heirs of Rabell,* 72 P.R.R. 536 (1951) ; *People* v. *Huyke,* 70 P.R.R. 720–22 (1950). The determination of this value requires a skillful synchronization of several factors and, in the last analysis, a sound equilibrium between the right of the property owners and the requirements of the community. This task becomes even more difficult in the metropolitan area where the land available is limited and has undergone an unprecedented increase in population which requires the expansion of the public services in order to adequately meet the needs of the citizens. Its determination excludes uncertain and purely speculative bases, *Commonwealth* v. *Heirs of Gautier,* 81 P.R.R. 565, 579 (1959) ; *Housing Authority* v. *Colón,* 73

P.R.R. 208 (1952); *People* v. *Huyke, supra.* The sale of similar properties is the best evidence of the market value, *People* v. *Amadeo,* 82 P.R.R. 98, 118 (1961), but this similarity does not presuppose equality but merely resemblance. Hence, it is pertinent to consider the similarity in topography, facilities, services, access, location, area, and the best use of the land taken and the comparable properties, *People* v. *Amadeo, supra; Commonwealth* v. *Bravo,* 79 P.R.R. 732, 738 (1956); *Commonwealth* v. *Ocean Park Dev. Corp.,* 79 P.R.R. 149 (1956); *People* v. *Colón,* 73 P.R.R. 531 (1952); *Housing Authority* v. *Colón,* 73 P.R.R. 208 (1952); *People* v. *Heirs of Rabell, supra; Housing Authority* v. *Viera,* 72 P.R.R. 683 (1951); *People* v. *Heirs of Quiñones,* 71 P.R.R. 242 (1951); *People* v. *Carmona,* 70 P.R.R. 292 (1949). The expert evidence also helps to form a criterion on the market value, but the trier is not bound to follow blindly the opinions given, *Commonwealth* v. *Bravo, supra; People* v. *McCormick, etc.; Floor Cov. Co., Int.,* 78 P.R.R. 895 (1956); *People* v. *Soc. Agríc. Mario Mercado e Hijos,* 72 P.R.R. 740 (1951), although we have expressed preference for similar sales over the expert opinion, which is at best "a guess by informed person." *Housing Authority* v. *Valldejuli,* 71 P.R.R. 600 (1950). It is always well to recall that there is no single measure of value, especially as respects lands. *People* v. *García,* 66 P.R.R. 478 (1946).

Let us examine the different sales offered in evidence.

## A

By deed of June 29, 1954, the Central San José Incorporada sold to the brothers Francisco, Pedro, and Jaime Fullana eight parcels of land situated in Río Piedras, Puerto Rico, with a total area of 26.089 cuerdas, for the price of $249,094.80, or at the rate of approximately $9,500 per cuerda. These were recorded in the registry of property as separate and independent properties, with the exception of two small parcels of 26 and 50 hundredths of a cuerda.

One of the parcels did not adjoin physically the remaining parcels, from which it was separated by the old state highway No. 1. The court concluded that "its location, its vicinity, its best use—commercial—and its topography were superior to those of the parcel taken, wherefore the value of these lands was much higher than that of the former (the condemned parcel)."

The appellant challenges the admission of this transaction on the ground that it involves the sale of a group of parcels, and because, in his opinion, there is a substantial difference in the location of the condemned parcel and the properties involved in this sale.

As a general rule, the sale of a group of parcels should be excluded from the consideration as similar sales, since there is a possibility that a buyer, in his desire to acquire a particular parcel, be compelled to buy other parcels of inferior conditions, and, furthermore, the apportionment of the price among the different parcels might be arbitrary. *Sanitary District* v. *Boening*, 107 N.E. 810 (Ill. 1915) ; *Lanquist* v. *City of Chicago*, 65 N.E. 681 (1902) ; Orgel, Valuation Under Eminent Domain 594, § 140 (2d ed. 1953) ; Jahr, Eminent Domain—Valuation and Procedure 214–15, § 139 (1957). However, this principle is not applicable in the instant case, since from the deed of conveyance it clearly appears that although the properties are recorded as separate and independent properties, they form a single tenement and were sold "as one single lot and for only one over-all lump price," and that the apportionment of the price among the different parcels was solely for the purpose of fixing the recording fees in the registry of property. The manifest intention of the parties was to execute a sale of a certain number of properties for a lump sum which, although for registration purposes they appeared as independent properties, they actually formed one unit from the point of view of their economic development.

Regarding the existing substantial difference between the location of both parcels, we believe that the appellant is not right either. There is no question that the parcel taken is located in the very heart of the metropolitan area, with possibilities of access to a greater number of persons, but the parcel object of this sale is situated on the outskirts of the town of Río Piedras, with obvious commercial facilities, particularly for the parking of vehicles, which has become so essential in the daily activities. On the other hand, the condemned parcel did not have immediate access to its surrounding heavy-traffic thoroughfares, while the parcel object of the sale under consideration was situated in the convergence of important means of communication. There is no question that after the zone adjacent to Roosevelt Avenue is fully developed, this difference would not have existed, or, in all probability, the comparison would have been favorable to appellant's property. However, we would indulge in a field of conjecture which is forbidden to us, for in the fixing of values it is necessary to consider the situation existing at the time of the taking. The error assigned was not committed.

## B

By deed of May 7, 1955—transaction executed approximately 16 months after the taking—the brothers Jaime and Jerónimo Fonalledas sold to the Industrial Development Company of Puerto Rico, a government instrumentality expressly vested with power to condemn (23 L.P.R.A. § 278 (g)), two parcels of land with an area of 31.601 cuerdas and 48.061 cuerdas, both of which were segregated from larger properties belonging to the said vendors, for the price of $214,886.80 and $326,814.80, respectively, or at the rate of $6,800 per cuerda. The trial court stated that "The location of this parcel, its public services, its vicinity, the

quality of its soil, its topography, its best use—it was classified as I-2, which permitted the installation of heavy industries, in addition to commercial and industrial use—are superior to those of the parcel taken and its value is therefore higher than that of the latter. Moreover, at the time of the transaction the market values of real property in the metropolitan zone increased about 50 per cent as compared with the prevailing values on December 24, 1953, when the Commonwealth acquired title to the parcel taken."

 One of the essential conditions in determining the admissibility of a sale is that it be free and spontaneous, *People* v. *Colón*, 73 P.R.R. 531, 541 (1952) ; *Housing Authority* v. *Sagastivelza*, 72 P.R.R. 262 (1951) ; *Housing Authority* v. *Valldejuli*, 71 P.R.R. 600 (1950) ; *People* v. *Lamboglia*, 70 P.R.R. 773 (1950). That is why we have not admitted evidence of the price paid by the Commonwealth in a settlement or by judgment in other condemnation suits, *People* v. *Colón*, 73 P.R.R. 531, 540 (1952), nor evidence of a purchase by a person who was compelled to make it because another property of his where he had a business had been condemned, *People* v. *Heirs of Rabell*, 72 P.R.R. 536, 542 (1951). However, it is in connection with sales made to an entity vested with the power of condemnation that we most frequently confront this determination. Our local rule does not exclude these transactions automatically, but the burden is on the party invoking the same, for the purposes of valuation, to show that it is a free and voluntary sale, although aided by the presumption that it was not under coercion. *Housing Authority* v. *Valldejuli*, 71 P.R.R. 600, 602 (1950). See, also, *People* v. *Amadeo, supra,* p. 112; *People* v. *Colón*, 73 P.R.R. 531, 541 (1952) ; *Housing Authority* v. *Sagastivelza*, 72 P.R.R. 262 (1951).

The appellant maintains that this transaction was not admissible because the sale was not voluntary, but a "forced"

sale.[1] We turn to examine the evidence offered in order to determine whether the trial court erred in admitting and considering the same for the purpose of fixing the final compensation.

In order to establish industrial projects, the Industrial Development Company of Puerto Rico made studies of the property of Fonalledas brothers, situated in Hato Rey, and consulted the Planning Board of Puerto Rico on the advisability of acquiring the parcels in question. 23 R.&R.P.R. §§ 23–2 and 23–4; *cf. Borinquen Home Corp.* v. *Planning Board*, 69 P.R.R. 194 (1948). The Board imparted its approval on January 25, 1955 for the acquisition of the lands. After making several appraisals, the Company wrote to the owners on March 7, 1955, informing them of its decision to acquire the parcels and making an offer for the sum of $173,805.50 and $264,355.50. The owners referred this letter to their attorney, Jaime J. Saldaña, with instructions to make all studies necessary and to negotiate with the Company, as well as to represent them before the courts if necessary.

Saldaña conferred with representatives of the Industrial Development Company and promised to develop the lands in question for the same purposes sought by this entity, thereby obviating the necessity of condemnation. The proposition was rejected because the Company wished to enlarge its adjacent industrial urbanization called Hato Rey Industrial Development, situated on lands previously acquired from Dr. Leandro López de la Rosa. In view of this attitude, the conversations continued and the representative of the owners

---

[1] The findings of the trial court on the existence of the differences between the parcels object of this sale and the parcel taken as respects location, quality of the soil, accessibility to public services, and best use, are not challenged. Nor is any question raised regarding the difference in the market value allegedly existing between the date of taking—December 24, 1953—and the date of this sale—May 7, 1955. Admitting the latter fact, the market value on December 24, 1953 of the parcels object of this sale would be approximately $4,500 per cuerda.

requested an increase of the original offer. Finally, the Company offered to pay $6,800 per cuerda, which represented an increase of $103,560.60 over the original offer, "stating that they were not willing to pay one penny more and that they would acquire the lands just the same—that they were not willing to pay more money for them." In the course of the negotiations the Company representatives ratified their "absolute and final decision to acquire these lands either by direct sale or by condemnation proceeding." In view of this situation, and in view of the increase obtained, Saldaña advised his clients to accept the last offer "thereby avoiding the anxiety and heavy expenses of a judicial proceeding, which always ... causes displeasure between the litigants."

The court held that under the facts summed up above the sale was voluntary, and to that end it considered that the price finally agreed upon was the result of negotiations between the parties which lasted approximately two months, and further, that "on several occasions prior to that sale properties of the Fonalledas brothers have been condemned, and that on those occasions in which they were not satisfied they have resorted to the Condemnation Court, a trial has been held, and judgment rendered."

Weighing carefully the evidence on the circumstances attending this transaction, we can not agree that the sale was free and spontaneous. It is necessary to bear in mind that the Fonalledas brothers had not offerred the parcels for sale in the market; that they had not procured their segregation from the Planning Board, but that the Industrial Development Company took this initiative prior to the acquisition; that, actually, after obtaining the initial approval of the Board, there was only one willing and available buyer for the property in question, namely, the interested agency to devote it to a public purpose; that the negotiations between the buyer and vendors took place subsequent to the approval of the segregation by the Planning Board; that the fact alone

of obtaining an increase in price contained in the original offer did not exclude the possibility of condemnation; that at all times the representatives of the purchasing agency indicated their absolute and firm decision to acquire the parcels either by sale or by condemnation if the final offer made to the representative of the vendors was rejected. Lastly, the fact that on this occasion the vendors preferred not to submit the controversy to judicial determination in a condemnation suit should not militate against them, particularly since the record discloses a reasonable explanation for this attitude. It was error to admit this sale in evidence.

## C

On June 18, 1953—six months prior to condemnation—Jerónimo Fonalledas agreed to sell a parcel of 9.3514 cuerdas to the Porto Rico Telephone Company for the total price of $110,260.98. Since the sale presupposed a previous segregation, the subdivision was submitted to the Planning Board, which required prior to its approval the construction of certain facilities. The construction cost of these facilities was estimated by the technicians of the Board at $70,219.25, and comprised the building of streets, including sidewalks, curbs and gutters, systems of hydraulic work, sewer, and electric distribution. After the obligation to provide these facilities was secured, the segregation was authorized and the corresponding deed executed. The purchasing corporation contributed the sum of $18,000 for the execution of such works. The court rejected this transaction on the ground that the parcel was "semiurbanized" and that, therefore, it was not comparable. It had previously dismissed the objection raised by the plaintiff to the effect that the purchaser was a special purchaser. *Cf. People* v. *Heirs of Rabell*, 72 P.R.R. 536, 542 (1951). We agree that in so doing it acted correctly, since the weighing of the entire evidence on the matter merely revealed that the parcel, because of its

central localization, had an additional inducement for the telephone company as well as for any other purchaser.

In *Commonwealth* v. *Ocean Park Development Corp.*, 79 P.R.R. 149, 153 (1956), we said that when the most suitable potential use of lands is their urbanization for the sale of lots, sales of urbanized lots in the same general area are admissible in evidence. In order to determine the value of the undeveloped land it is only necessary to deduct the cost of urbanizing, the reduction of the area resulting from the division into lots, and a reasonable profit for the sponsor of the project. See *Housing Authority* v. *Sagastivelza*, 72 P.R.R. 262 (1951), and *Housing Authority* v. *Viera*, 72 P.R.R. 683 (1951).

In the case at bar there is a difference between the area of the two parcels. However, their location and classification for zoning purposes is the same and, in fact, we gather the impression that, bearing in mind the difference between both and readjusting the appraisal for that reason,[2] this parcel was similar to the parcel taken. *Housing Authority* v. *Viera*, 72 P.R.R. 683 (1951); *People* v. *Heirs of Quiñones*, 71 P.R.R. 242 (1950); *People* v. *Carmona*, 70 P.R.R. 292 (1949). Moreover, this transaction is the only one among those considered which was executed *prior* to condemnation and reveals more adequately the market conditions. The offer of evidence should have been admitted and it deserved some consideration in the last analysis for fixing the compensation.

---

[2] If to the selling price of $110,260.98 is added the sum of $18,000, contributed by the purchaser for the execution of the works required by the Planning Board, the acquisition was evidently made for $128,260.98. From this amount may be subtracted the estimated cost of the necessary works, as determined by that agency, namely, $70,219.25, thereby obtaining the approximate price of the undeveloped land: $58,041.73. The price would be some $6,200 per cuerda. Of course, we admit that part of the cost of the works was beneficial to the adjoining lands of the vendor and that, therefore, we could not attribute it wholly to the parcel taken.

## II

### *Damages to the Remainder*

As a result of the taking the area of the main property of 133.10 cuerdas owned by the defendant was reduced to approximately 89.89 cuerdas and divided into two parcels of land without physical contiguity: one, rectangular in shape, of 34.53 cuerdas, situated on the eastern part of the property taken; the other, of very irregular shape, of 55.36 cuerdas, situated northeast of the property taken. No damages are claimed as a result of the severance of the rectangular parcel.

The parcel of 55.36 cuerdas is divided into two parcels of 34.17 and 21.19 cuerdas, situated, respectively, on the west and north of the property taken. The evidence for the owner tended to establish that these portions have been practically isolated—"bottled up" was the term used in describing their location after condemnation—and that as a result of their irregular shape their best use is limited and is affected for a better development, more harmonious with the remainder of the area. It was further pointed out that such configuration required greater urbanization expenses. On the basis of these factors, the expert for the defendant used the "usual" method and estimated the severance damages at $32,284, or the difference in value of this remaining parcel of 55.36 cuerdas before ($264,530) and after ($232, 246) the condemnation. For the purpose of determining the value of such remainder before condemnation, the same was considered as part of the property, "as an integral part of the property." (R. at 147.) He testified specifically that he did not use the method of evaluating the entire property before and after condemnation.

Other pertinent facts in determining whether the damages to the remaining property issued were obtained through the cross-examination by the plaintiff and questioning by the presiding judge. It was said that as a result of the con-

struction of the works of the housing project situated on the parcel taken, this remainder has three accesses consisting in three streets abutting on its northern, eastern, and western boundaries, although it was maintained that these streets of the housing project can not be "synchronized" with a future industrial development of the remainder. Upon insistent questioning on this aspect, the expert admitted that in assessing the damages he considered only the existence of the accesses consisting in the streets six meters wide having exit to the north and east, but that he did not consider another access 18 meters wide subsequently constructed on the west (R. at 177), and that if he had done so "he would modify [the estimate of the damages] because there is no doubt that an access, if it is ample, unquestionably reduces the damages" (R. at 157). He then repeated that this third access "eliminates considerably" the damages (R. at 160). He also admitted that he had no knowledge of a preliminary development for the use of part of the lands of the remaining property within which these streets of the housing project are co-ordinated in thoroughfares that will service the industrial urbanization. He made reference to the reduction of the sewer, lighting, and water facilities, but admitted that as a result of the construction of the project such facilities are closer to the remaining portion at no cost to the owner, which is "beneficial" to him (R. at 180).

In a condemnation proceeding the owner of the land taken may claim compensation for the damages caused by the condemnation to the remaining portion of his property, *People* v. *García,* 66 P.R.R. 478, 484 (1946),[3] but he is bound to establish the existence of such damages with positive evi-

---

[3] In the case of *People* v. *García, supra,* we said that the owner's right arises from the clause of § 2 of the Organic Act of 1917, which provided, among other things, that "private property shall not be taken or *damaged...* except upon payment of just compensation ..." The same result is reached by applying § 9 of Art. II of the Constitution of the Commonwealth, conceived in practically identical terms.

dence, *People* v. *Soc. Agric. Mario Mercado e Hijos*, 72 P.R.R. 740 (1951). The Commonwealth maintains, however, that the defendant-appellant did not use the method sanctioned by this Court in assessing the damages, since "he should have evaluated in their entirety the 133 cuerdas (total area of the main property) and then the remainder." We must therefore re-examine the different appraisal methods for assessing severance damages as well as our previous cases on the matter.

The damages to the remainder of a condemned property are generally measured by the depreciation in the value of the remainder as a result of the taking. In order to award these damages, it is usually necessary that the properties—the property taken and the remainder—be contiguous. See *Unity or contiguity of properties essential to allowance of damages in eminent domain proceedings on account of remaining property*, 6 A.L.R.2d 1197 (1949). In these cases of partial condemnation, the American courts have employed two methods [4] in determining the amount of the compensation to be allowed to the condemnee, including the sum for severance damages. A majority favor the so-called "usual" rule, which consists in awarding as total compensation the amount of the market value of the parcel taken—irrespective of its relation to the entire property—plus the damages to the remainder of the main property, which consists in the depreciation of the market value of the remainder before and after the taking.[5] Other jurisdictions

---

[4] A third method is also employed, which is less favored—with the possible exception of the State of Louisiana—which consists in including in a single sum the damages to the remainder in the market value of the parcel taken.

[5] The "usual" method offers certain immediate advantages to the condemnee from the tax viewpoint, since for the purposes of computing the taxable gain there shall be considered only the sum awarded as market value of the parcel taken, excluding severance damages. The amount awarded for damages merely reduces the basis or cost of the remainder. See *Seaside Improvement Co.* v. *Commissioner*, 105 F.2d 990 (C.C.A. 2, 1939); *Estate of Appleby*, 41 B.T.A. 18 (1940).

have adopted the method known as "before and after" method, whereby there is allowed as *total compensation* the difference between the market value of the principal property before the taking and the value of the remainder after the taking. It. therefore presupposes a process of indivisible valuation, without division of compensatory titles. The authorities on the matter prefer the latter, arguing that it is more accurate and that it prevents "the artificial dichotomy" of the "usual" method, under which there is a possibility of awarding double compensation, *State* v. *Carpenter*, 89 S.W.2d 194 (1936) ; *Dept. of Public Works* v. *Griffin*, 137 N.E. 523 (1922), in view of the impossibility of considering the parcel taken, for the purpose of fixing its market value, divorced from its usefulness as part of the main property.[6] 1 Orgel, Valuation under Eminent Domain 232–302 (1953), especially § § 48 to 53, 57, 64 and 65; 4 Nichols, On Eminent Domain, § § 14.21 and 14.231 to 14.232(1) (3d ed. 1951) ; Jahr, Eminent Domain—Valuation and Procedure, § § 96–104 (1957) ; Schmutz, Condemnation Appraisal Handbook 126–29 (1949) ; McMichael, Appraising Manual 424–26 (3d ed. 1948) ; Dennis, *Partial Takings—Severance Damages and Just Compensation*, 34 So. Cal. L. Rev. 319–34 (1961) ; Goldstein, *Economic Evidence in Right of Way Litigation*, 50 Geo. L. Rev. 205, 207–13 (1961) ; Burns, *Damages and Benefits from Constitutional Damaging and Partial Taking*, Institute on Eminent Domain 119–38 (1961) ; Notes, 42 Minn. L. Rev. 106, 110–19 (1957).

In our jurisdiction the first reference to severance damages appears in *People* v. *García*, 66 P.R.R. 478 (1946). Two parcels of 1,200.04 square meters and 1.819 cuerdas were segregated from the main property on which there stood a house which the defendant devoted to dwelling. In addition to the market value of the two parcels taken, dam-

---

[6] Since in Puerto Rico condemnation proceedings are not tried by a jury, this risk is minimum.

ages were claimed for the depreciation of the house as a result of the deprivation of direct access to the road built on the land taken, and to the great amount of dust thrown upon it from the road which rendered the house uninhabitable. We stated at p. 486 that the damage sustained was "the difference between the market value of *the house* before and after the construction of the viaduct." As may be seen, the court intimated that the proper method for appraising the severance damages was the "usual" method, for it estimated that the compensation allowable would include not only the market value of the land taken but also the damages caused to the house which was part of the *remainder*.

Notwithstanding the fact that we clearly stated in *People* v. *Anadón*, 69 P.R.R. 766 (1949), that severance damages "have nothing to do with the just value in itself of the condemned parcel of land to which appellants are entitled as compensation" (p. 770), we departed from the norm intimated in *People* v. *García, supra,* and announced that "it was incumbent on the appellants to prove the just value of the property [referring to the whole of the main property] before the taking of the ten acres [condemned] and the just value of the part remaining." We cited with approval commentators Nichols and Lewis, *op. cit.,* and from the opinion in *Baetjer* v. *United States,* 143 F.2d 391–96 (C.C.A. 1, 1944), to hold that "the evidence necessary to prove depreciation damages" is the difference between the fair market value of the entire unitary tract before the taking and the fair market value of the tract remaining thereafter. However, a careful reading of the authorities cited will readily reveal that the difference in value referred to is the measure for determining the total compensation (which includes, of course, severance damages), but it is not the measure for determining isolatedly the amount of such damages, which will later be added to the market value of the parcel taken.

If this were so, it is clear that the amount of the damages would be included twice in the final total compensation.

Two years later, in *People* v. *Heirs. of Rabell*, 72 P.R.R. 536, 540–41 (1951), we dismissed the challenge made by the condemnor of the award of $512.50 to the defendant for severance damages, which was computed on the basis of the value of the *remainder* before and after the taking. Once again we adopted the "usual" rule in assessing these damages, to which we referred as "a real and actual decrease in the market value of that parcel." Likewise—depreciation of the *remainder*, not of the whole of the main property—we referred in *People* v. *Soc. Agríc. Mario Mercado e Hijos*, 72 P.R.R. 740 (1951), to the measure of the damages sustained by the condemnee in connection with a parcel of the main property which was separated at five feet below the level of the means of communication to be constructed on the parcel taken: "the measure of damages of *parcel 'A'* could not be limited to the cost of the access but to the decrease of *its market value...*"

In *Commonwealth* v. *Bravo*, 79 P.R.R. 732, 737 (1956), we said by way of dictum that "the rule to determine the measure of severance damages when part of a tract is taken has already been established by our cases. It is the difference between the fair market value of the property as a whole before the taking and the fair market value of what remains." We have no doubt that this affirmation was prompted by the expression contained in the case of *People* v. *Anadón, supra*, which we have commented hereinabove. As we have shown in the discussion of our decisions on the matter, it seems that this Court has adopted the majority rule, namely, the "usual" rule, and in that connection it should be understood that what we sought to establish in the *Bravo* case is that the measure of the depreciation damages is the difference in the market value of the *remainder* before and after the taking. This difference in value, which is

translated into a specific amount of money, added to the amount of the market value of the parcel taken, constitutes the total compensation to which the owner of the tenement taken is entitled.

We must therefore conclude that the expert for the defendant used the method of measure of the severance damages which had been judicially sanctioned by our scant decisions up to that time.[7] However, the trial court did not base its conclusion as to the existence of these damages on the fact that the defendant had not proved them in the manner alleged by the Secretary of Justice, but analyzed the evidence and held that the factors pointed out by the defendant did not warrant their award. Not only was it shown that the remainder was not isolated as a result of the condemnation, but that an objective weighing of the facts as summed up above shows that the appellant has not been prejudiced in any manner whatever. The only factor to be considered as a possible source of damages—the irregular shape of the remainder—vanishes in view of the rest of the evidence which established the possibility of its harmonious development. Furthermore, it can not be denied that part of the irregular shape was due to the division of the community existing between the defendant and his brothers. Anyway, the expert's testimony on the amount of $32,284 claimed was highly questionable after the admissions which he made in the cross-examination and upon being questioned by the presiding judge to which we have referred hereinabove.

This being so, we will not alter the conclusion of the Condemnation Court in this connection. The error was not committed.

---

[7] It is necessary to clarify that the testimony of defendant's expert to which we have made reference was given on September 10 and October 1, 1956, when the opinion in *Commonwealth* v. *Bravo, supra,* dated December 13 of that year, had not yet been rendered.

## III

██ ██ The preceding discussion and a reading of the transcript of evidence has convinced us that the trial court did not consider all the elements of proof available in order to arrive at the final determination of the market value of the parcel taken, and also that it placed too much emphasis on other factors and concurrent circumstances. Regarding the weighing of the expert evidence, we are in the same position as the trial judge since we are not concerned, strictly speaking, with the resolution of a clearly defined conflict in the evidence, inasmuch as there is no substantial discrepancy as to the physical characteristics of the property or the factors to be applied in determining the valuation. We are rather concerned with a difference in the emphasis which should be placed on these factors. In view of the conclusion reached, we need not discuss the other errors assigned by the appellant.

Ordinarily, we would remand the case to the Condemnation Court to make new findings in the light of the views stated in this opinion. *People* v. *Amadeo, supra.* However, considering that this litigation was commenced approximately nine years ago, that the transcript of evidence is very lengthy and the documentary evidence abundant and has been carefully examined by this Court in the consideration of the petition, and that at the trial the parties stated that they preferred that this Court render judgment as would be proper, we will do so.

The judgment rendered by the Superior Court, Condemnation Part, on March 15, 1957, will be modified in the sense of fixing the market value of the parcel taken as of the date of taking, at the rate of $4,500 per cuerda. Furthermore, the plaintiff shall pay interest at the legal rate as of the date of the taking on the difference between the sum herein fixed and the sum originally deposited, 32 L.P.R.A. § 2908. As thus modified, it will be affirmed.